# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**DAVID EASLEY,**

      Plaintiff,

      v.

**CORRECTION OFFICER MEGAN
MARIE DIDION, et al.,**

      Defendants.

CASE NO. 3:24 CV 943

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND
ORDER**

### INTRODUCTION

Currently pending before the Court in this § 1983 civil rights action alleging excessive force, deliberate indifference to medical needs, and conspiracy is Defendants Anitra Barker, Megan Didion, and Cleavon Speigner's[1] Motion for Summary Judgment. (Doc. 25). Plaintiff David Easley has not responded to the Motion and the time in which to do so has expired. *See* Loc. Civ. R. 7.1(d). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, the Court grants Defendants' Motion.

### BACKGROUND

At all relevant times, Plaintiff was an inmate at the Toledo Correctional Institution ("ToCI"). Plaintiff brings a medical deliberate indifference claim against Barker, the Assistant Healthcare Administrator at ToCI, and an excessive force claim against Didion and Speigner, both

---

1. Plaintiff spells this Officer's last name "Spiegner." *See* Doc. 20, at 1. Defendants, and the Officer himself in his Affidavit spell it "Speigner." *See* Docs. 25, 25-1. The Court uses the spelling provided by Defendants.

Correctional Officers at ToCI. *See* Doc. 20. He further brings a "conspiracy to destroy body camera evidence" claim against Didion. *Id.* at 2.

Use of Force

In Plaintiff's Amended Complaint[2] and attached sworn Affidavit, Plaintiff asserts that on January 26, 2023, Speigner "slammed" his hand and wrist in the metal food hatch "multiple times" while Didion sprayed over 106 milligrams of OC spray. (Doc. 20, at 1); *see also* Doc. 20-1, at 1. He asserts he was not a threat, and was "complying [with] orders to eat [his] food" as he was heard on the video "ask[ing] to get food off the cart to avoid any foul play." (Doc. 20, at 1).. He asserts Speigner told him "he had . . . picked out a tray of food to target [Plaintiff's] food." *Id.* at 1-2.[3] Plaintiff asserts Didion used "excessive OC gas mace . . . wit[h] malice and sadistic intent to inflict pain." *Id.* at 2. Plaintiff additionally avers both Didion and Speigner "engage[d] in excessive force." (Doc. 20-1, at 2).

The at-issue incident was captured on video by body cameras worn by Correctional Officers Didion and Speigner. *See* Defs' Exs. C & D.[4]

On January 26, 2023, Didion and Speigner were distributing meal trays to inmates at ToCI. (Speigner Aff., Doc. 25-1, at ¶ 4); (Didion Aff., Doc. 25-2, at ¶ 4); *see* Exs. C & D. On this date, Plaintiff was on a "'magnet restriction' for masturbating toward prison staff." (Speigner Aff., at ¶ 10); (Didion Aff., at ¶ 10).[5]

---

2. Because Plaintiff's Amended Complaint is verified, *see* Doc. 20, at 3, it serves as an Affidavit for purposes of summary judgment. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).
3. No such statement can be heard on Speigner's body camera video. *See* Ex. D.
4. Exhibit C is Didion's body cam footage and Exhibit D is Speigner's body cam footage.
5. A "magnet restriction" is where the window of a prisoner's cell is blocked with a magnetic cover. (Speigner Aff., at ¶ 10); (Didion Aff., \ at ¶ 10). Officer Speigner removes this magnet from Plaintiff's cell window as officers approached with the meal trays. (Ex. D, at 0:20-:23)

2

Both Speigner and Didion describe the standard procedure for delivering a meal tray to an inmate "is to open the cuff port, place the food on the inner flap, and allow the inmate to retrieve it before securing the cuff port." (Speigner Aff., at ¶ 6); (Didion Aff., at ¶ 6). The reason for this procedure is that it is "common occurrence at TOCI that inmates reach through the cuff port to assault staff with bodily fluids, including spit, urine, and other substances." (Speigner Aff., at ¶ 8); (Didion Aff., at ¶ 8). Didion and Speigner further aver there "is no legitimate reason for an inmate to extend both arms through the cuff port." (Speigner Aff., at ¶ 9); (Didion Aff., at ¶ 9).

As the officers approach Plaintiff's cell, Plaintiff can be heard saying "I know y'all are trying to put fentanyl in my tray." (Ex. C, at 0:18-:27); *see also* Speigner Aff., at ¶ 5 (describing Plaintiff as "agitated" because he thought officers were contaminating his meal tray with fentanyl); (Didion Aff., at ¶ 5) (same). Didion picks up a meal tray and hands it to another correctional officer. (Ex. C, at 0:25-:32). Speigner opens the cuff port and the officer holding the tray hands the tray to him. (Ex. C, at 0:32-:45); (Ex. D, at 0:30-:38). During this time, Plaintiff repeatedly says he does not want the meal tray selected, but wants one from the middle of the stack. (Ex. C, at 0:35-:55); (Ex. D, at 0:34-:50).

At the door of Plaintiff's cell, Speigner first passes Plaintiff a banana that came with the meal tray; he then begins to place the tray down on the flap. (Ex. C, at 0:43-:52). Plaintiff continues to insist he wants a tray from the middle and seemingly pushes the tray back toward Speigner. (Ex. C, at 0:43-:57). Speigner then lifts the tray away with his right hand, and Plaintiff visibly reaches at least one of his hands through the cuff port. (Ex. C, at 0:54-:58). Speigner uses his thigh to close the cuff port, causing it to close on Plaintiff's left forearm / right hand. (Ex. C, at 0:55-1:01); *see also* Speigner Aff., at ¶ 12. At the same time, Didion moves closer to the cell door and deploys "a short burst of OC Spray through the cuff port." (Didion Aff., at ¶ 11); Ex. C, at 0:55-1:01. During

3

the next approximately thirty seconds, Didion deploys three more bursts of OC spray through the cuff port while Speigner attempts to physically force Plaintiff's hands back inside the cell and close the cuff port. (Ex. C, at 0:54-1:25); (Didion Aff., at ¶ 12). The video is somewhat obscured, but during the struggle, both Didion and Speigner give Plaintiff commands including, "move your hands," "let go," "stop," and "quit grabbing." (Ex. D, at 1:05-:18); *see also* Speigner Aff., at ¶ 14; Didion Aff., at ¶ 11. Plaintiff continues to insist that he wants a meal tray from the "middle." (Ex. C, 1:00-:04). In response to one instruction to move his hands, Plaintiff replies, "you gonna break it?" (Ex. C, at 1:05-1:10). Plaintiff's hands are visible outside the cuff port near Speigner's hip during part of the incident. (Ex. C, at 1:10-1:17)

In all, the struggle between the officers and Plaintiff through the cuff port lasts approximately thirty seconds. *See* Ex. C, at 0:54-1:25. After this short struggle, Speigner is able to close and secure the cuff port. (Ex. C, at 1:24-:26). Shortly after the cuff port is secured, the officers realized Plaintiff had grabbed Speigner's radio during the altercation; the officers state Plaintiff smashed the radio inside his cell. (Speigner Aff., at ¶ 15); (Didion Aff., at ¶ 14).

At the time of the incident, Speigner was concerned Plaintiff might try to grab him or throw something at him and asserts he used "only minimally necessary force to prevent an assault or escalation." (Speigner Aff., at ¶ 11). Didion deployed OC spray "in an attempt to get [Plaintiff] to remove his hands and back away from the cuff port . . . to prevent an assault or escalation." (Didion Aff., at ¶ 13).

Obscured Body Camera

Plaintiff asserts Didion "cover[ed] [her] body camera wit[h] [her] hand to conceal [and] destroy" evidence. (Doc. 20, at 2); *see also* Doc. 20-1, at 1-2.

4

Didion's body camera video is obscured by her gloved hand for approximately five seconds as she approaches the cell and before she deploys the OC spray, shortly after Speigner first attempts to close the cuff port with his leg. (Ex C, at 1:00-:05). Defendants provide evidence in the form of Didion's sworn statements indicating she never intentionally covered her body cam during the incident but it instead "was inadvertent and temporary, resulting from the chaotic nature of the struggle." (Didion Aff., at ¶ 15).

<u>Medical Treatment</u>

In his Amended Complaint, Plaintiff asserts "after the assault, [his] medical referral slips and X rays went unanswered and ignored for almost [a] month and two weeks to make sure the injuries healed up." (Doc. 20, at 3). He further asserts he "repeatedly kept being refused medical treatment after complaints to Anitra Barker Medical Supervisor for X rays and photos of the wrist and X ray[s] for bone fracture." *Id.*

Barker is the Assistant Healthcare Administrator at ToCI. (Barker Aff., Doc. 25-7, at ¶ 2). In that position she maintains the nurse schedule, orders medical equipment at the express direction of doctors, and serves as the Medicaid Coordinator for ToCI; her job duties "do not involve any direct participation in providing or approving medical care" or "receiving, responding to, or otherwise addressing in any way, health care slips" from prisoners. *Id.* at ¶¶ 3-5. She states she did not receive any health care request slips from Plaintiff, was not aware of the at-issue incident or Plaintiff's injuries prior to the filing of his lawsuit, and was not involved in Plaintiff's medical care. *Id.* at ¶¶ 6-8.

5

Medical records provided by Defendants indicate Plaintiff was evaluated on the date of the incident. *See* Doc. 25-6, at 3.[6] Therein, the evaluating nurse, Breanna Davis, recorded Plaintiff stated: "I'm fine but earlier the doors opened and they slammed my left arm in the cuff port 30 plus times and I got sprayed." *Id.* Examination of Plaintiff's left arm revealed "no deformity/swelling/redness/bruising/drainage," and Plaintiff had full range of motion. *Id.* The nurse wrote Plaintiff had "no visible/physical injuries." *Id.* On February 5, 2023, Plaintiff wrote a health services request stating: "Need to see Doctor[.] Left arm still in pain via . . . Jan. 26, 2023 Officer[s] Speigner and Didion used excessive force[,] slam[med] my arm in food hatch numerous times." *Id.* at 12. This slip is noted to be received by "M. Mathews, RN.," who then scheduled Plaintiff for a nurse sick call visit. *Id.* at 11-12. On February 6, 2023, one day later and eleven days after the incident, Plaintiff was seen by Nurse Michael Mathews. *Id.* at 7-9. Plaintiff reported continued left arm pain and a "painful knot" in his left forearm. *Id.* at 7. Examination revealed a "[k]not to [the] medial aspect of the [left forearm . . . with pain upon palpation." *Id.* at 8. The record indicates Plaintiff was given ibuprofen and acetaminophen and advised to use warm soaks or compression "for comfort." *Id.* at 8-9.

### STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine

---

6. Plaintiff has not disputed the authenticity of these records or provided any additional evidence of his injuries.

the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257; *see also* Fed. R. Civ. P. 56(c)(1). Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine dispute of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

A genuine issue of material fact generally does not exist where the record could not "lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co*, 475 U.S. at 587. This is true even when opposing parties allege two different sets of facts but one is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, the court must view any facts that are not blatantly contradicted by the record in the light most favorable to the non-moving party. *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011).

### DISCUSSION

Defendants move for summary judgment asserting: (1) Plaintiff's claims against Defendants in their official capacities are barred by Ohio's sovereign immunity; and (2) Plaintiff's Eighth Amendment deliberate indifference to medical needs claim against Barker fails for lack of

7

personal involvement and lack of evidence as to the subjective prong of such a claim; (3) Plaintiff's excessive force claims against Didion and Speigner fail because Plaintiff cannot establish either the objective or subjective component of such a claim; and (4) Plaintiff's claim of "conspiracy to destroy body camera evidence" is baseless. *See* Doc. 25. Defendants further claim entitlement to qualified immunity because Plaintiff has not demonstrated that any violated a clearly established constitutional right. *See id.* at 17-20. For the reasons discussed below, the Court grants Defendants' motion.

Official Capacity Claims

Defendants first contend that to the extent Plaintiff brings claims against them in their official capacities, such claims are barred by Ohio's sovereign immunity. (Doc. 25, at 6-7). They correctly note Plaintiff's Amended Complaint "does not specify whether he is suing Defendants in their official or individual capacities." *Id.* at 6; *see also* Doc. 20.[7]

Regardless, Defendants are correct that they are immune from any official capacity damages claims. A suit against a state official operates as an action against the state itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). The State of Ohio has not waived its sovereign immunity, nor has it consented to civil rights suits in federal court. *Mixon v. Ohio*, 193 F.3d 389, 397 (6th Cir. 1999). Thus, any official capacity claims are barred by sovereign immunity. *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513-14 (6th Cir. 2021).

---

7. The Court observes Plaintiff indicated in his original complaint he asserted both individual and official capacity claims. *See* Doc. 1, at 3-4.

Deliberate Indifference

Plaintiff asserts a medical deliberate indifference claim against Barker. Defendants contend Plaintiff has not demonstrated personal involvement, nor that "Barker was aware of any facts from which to infer that Plaintiff had a serious risk of harm and ignored those facts." (Doc. 25, at 11).

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right secured by the federal Constitution or laws and must show such deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

Plaintiff brings his § 1983 claims under the Eighth Amendment, which prohibits officials from inflicting "cruel and unusual punishments" on those convicted of crimes. U.S. Const. amend. VIII. The Supreme Court has held officials violate this prohibition if they show "'deliberate indifference' to a substantial risk of serious harm" to prisoners. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Deliberate indifference requires a culpability level higher "than ordinary negligence." *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024). This rule requires officials to provide "medical care" to prisoners to prevent the "pain and suffering" that might result from their untreated "health conditions." *Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). To prove an Eighth Amendment violation based on the lack of medical care, prisoners must prove objective and subjective elements. *Farmer*, 511 U.S. at 834. Objectively, a medical condition must rise to a "sufficiently serious" level. *Phillips*, 14 F.4th at 534. Subjectively, officials must "know of the facts that show the serious medical need," and "personally conclude that this need exists." *Id.* at 535; *see also Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021) ("[T]he plaintiff must demonstrate that the official was aware of

9

facts from which an inference of substantial risk of serious harm to inmate health or safety could be drawn and that the official actually drew the inference.") (citing *Farmer*, 511 U.S. at 837).

A plaintiff must therefore show each defendant personally participated "in the unconstitutional action" in some way. *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020); *see also Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior."); *Sexton v. Cernut*o, 18 F.4th 177, 185-86 (6th Cir. 2021) (holding a plaintiff must show each defendant played an "active role" in the alleged constitutional violation to be held liable under § 1983). Those who supervise medical personnel, for example, must have "implicitly authorized, approved or knowingly acquiesced in" the medical personnel's misconduct in a way that shows their own deliberate indifference. *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020)). A supervisor's "mere failure to act" generally will not suffice. *See id.* (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016)).

Construing Plaintiff's Verified Amended Complaint generously in his favor, there exists a question of fact regarding whether Barker received or was aware of complaints from Plaintiff. *Compare* Doc. 20, at 3 ("I repeatedly kept being refused medical treatment after complaints to Anitra Barker."), *with* Barker Aff., Doc. 25-7, at ¶¶ 6-8 (stating Barker had no awareness of Plaintiff's alleged injuries and did not receive any health care request slips). But there is no evidence of what these "complaints" Plaintiff cites contained. Without such evidence, no reasonable jury could conclude Barker's actions satisfy the subjective component of a deliberate indifference claim because there is no evidence to support that Barker knew of "facts that show [a] serious medical need," and "personally conclude[d] that this need exists." *Phillips*, 14 F.4th at

10

535; *see also* Barker Aff., Doc. 25-7, at ¶¶ 6-8. And there is no dispute of fact regarding whether Barker had any authority over or ability to make decisions regarding inmate medical care. *See* Barker Aff., Doc. 25-7, at ¶¶ 2-5.

For these reasons, the Court grants summary judgment to Barker.

Excessive Force

Plaintiff additionally brings an excessive force claim against Speigner and Didion under the Eighth Amendment. The Eighth Amendment regulates the force that prison guards use on prisoners. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). Its ban on cruel and unusual punishments prohibits the "unnecessary and wanton infliction of pain." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 319); *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

This "unnecessary and wanton infliction of pain" requirement "has objective and subjective components, both of which follow from the Eighth Amendment's text." *Johnson v. Sootsman*, 79 F.4th 608, 615 (6th Cir. 2023).

> Objectively, harm to a prisoner must rise to a sufficiently serious level because the Eighth Amendment prohibits only "cruel and unusual" deprivations, not just uncomfortable or "even harsh" ones. Subjectively, harm to a prisoner must result from a prison official's sufficiently volitional actions because the Eighth Amendment bars only willful conduct that "inflict[s]" "punishment," not accidental conduct that causes injury.

*Id.* (internal citations omitted).

"As a subjective matter . . . prisoners who challenge a correctional officer's use of force must prove more than that the officer acted with 'deliberate indifference' to whether the force was necessary (the type of intent that prisoners must prove to challenge their conditions of confinement or medical care)." *Id.* at 616 (citing *Hudson*, 503 U.S. at 5-6). "The Court has instead described the 'core judicial inquiry' in this use-of-force context as distinguishing between force used in a

11

'good-faith effort to maintain or restore discipline' and force used 'maliciously and sadistically to cause harm.'" *Id.* (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam)); *see also Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) ("[I]n the prison context, good faith use of physical force may be necessary to maintain prison security and discipline."). "So even if an officer uses force because of an 'unreasonable' belief that it is necessary to restrain a prisoner, the officer does not violate the Eighth Amendment." *Johnson*, 79 F.4th at 616.. (quoting *Whitley*, 475 U.S. at 324). The Eighth Amendment also "necessarily excludes from constitutional recognition *de minimis* uses of physical force" so long as the use of force is not the type of force that would be "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). "The negligent use of force—even the reckless use of force—does not establish an Eighth Amendment claim; [Plaintiff] must prove the malicious use of force for the exclusive purpose to inflict pain." *Johnson*, 79 F.4th at 621.

> To decide whether a jury could find that an officer acted with this malicious intent, the Supreme Court has identified several factors to consider: What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer take any actions designed to reduce the required amount of force?

*Id.* at 618. Courts also approach such claims with deference to avoid "unreasonable *post hoc* judicial second-guessing" of officers' conduct. *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2008) (quoting *Parrish v. Johnson*, 800 F.2d 600, 605 (6th Cir. 1986)); *see also Johnson*, 79 F.4th at 618 ("[W]hile judges may review an encounter by slowing down, pausing, and replaying a video, officers have no such luxury. They must make quick decisions in the heat of the moment.").

On review of the evidence presented in accordance with the above guidance, the Court finds Plaintiff has not established a genuine issue of material fact regarding the subjective component of his Eighth Amendment excessive force claim as to either Speigner or Didion.

12

*Extent of the Injury*

First, "although the Eighth Amendment does not require a prisoner to suffer a 'serious injury,' the 'absence' of such an injury goes a long way to disprove any claim that an officer used force with the required intent to harm." *Johnson*, 79 F.4th at 618-19 (quoting *Hudson*, 503 U.S. at 7-8). The Sixth Circuit has "denied a prisoner's Eighth Amendment claim when an officer's use of force caused the prisoner minimal injuries such as 'only some tenderness, bruising, and slight swelling[,]' or 'minor lacerations and cuts.'" *Id.* at 619. (first quoting *Bullocks v. Hale*, 2021 WL 1578198, at *2 (6th Cir.), and then quoting *Lockett*, 526 F.3d at 876); *see also Richmond v. Settles*, 450 F. App'x 448, 453–54 (6th Cir. 2011) (finding no more than *de minimis* injury where prisoner's left knee was "knocked out of joint," but he was able to "pop" it back in and he had no redness, swelling, heat, or abrasion on the knee and only "small superficial abrasions" on his elbow and shoulder). The evidence here shows Plaintiff's injury consisted of a "knot" in his left forearm and "pain upon palpation" (Doc. 25-6, at 8), which are analogous to the sort of "minor injuries" found to be insufficient. *Lockett*, 526 F.3d at 876; *Bullocks*, 2021 WL 1578198, at *2. Further, although Plaintiff objects to Didion's use of OC spray, he provides no evidence of injury resulting therefrom. *Cf. Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (finding the use of OC spray "merely was uncomfortable in the ordinary fashion of persons exposed to pepper spray" and was not a significant injury).

*Nature of the Threat*

Second, Defendants had a "plausible basis" to believe Plaintiff presented a threat at the time of the use of force. *Whitley*, 475 U.S. at 323. Although Plaintiff asserts conclusorily that the officers acted "wit[h] malice and sadistic intent to inflict pain" (Doc. 20, at 2), and "engaged in

13

excessive force" (Doc. 20-1, at 2), these are legal conclusions and do not create a genuine dispute of material fact.

Again, "[t]he negligent use of force—even the reckless use of force—does not establish an Eighth Amendment claim; [Plaintiff] must prove the malicious use of force for the exclusive purpose to inflict pain." *Johnson*, 79 F.4th at 621. Although Plaintiff asserts he was not a threat and was "complying with orders" (Doc. 20-1, at 1), it is not Plaintiff's subjective intent that matters, but how his conduct would be perceived by a reasonable officer in Defendants' position. *See, e.g.*, *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015) ("His purported subjective intent to comply with the officers' requests fares no better, for we view his actions *objectively*, from the perspective of a reasonable officer at the scene."); *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 350 (6th Cir. 2007) ("[T]he subjective intent of the [plaintiff]—unavailable to the officers who must make a split-second judgment—is irrelevant to the question whether his actions gave rise to a reasonable perception of danger.") (Boggs, J., concurring). Defendants present evidence that it is a common occurrence for inmates at ToCI to reach through the cuff port "to assault staff with bodily fluids, including spit, urine, and other substances" and that there is no legitimate reason for an inmate to extend both arms through the cuff port. (Speigner Aff., at ¶¶ 8-9); (Didion Aff., at ¶¶ 8-9). Moreover, Defendants present evidence Plaintiff himself was on "'magnet restriction' for masturbating toward prison staff" at the time of the incident. (Speigner Aff., at ¶ 10); (Didion Aff., at ¶ 10). Given this evidence – which goes unchallenged by Plaintiff – a reasonable officer would have perceived Plaintiff's actions in reaching his hands through the cuff port as a threat. The fact that Plaintiff was able to obtain Officer Speigner's radio through the cuff port during the struggle additionally confirms Plaintiff was grabbing at the officers. Further, Plaintiff's own description of the events, combined with the video evidence, contradicts his assertion that he was compliant. *See*

Doc. 20, at 1 (stating he was "complying" with orders to eat his food by asking for a different food tray off the cart "as heard on camera"); *see generally* Exs. C & D. Finally, even if, "in retrospect," a jury found "unreasonable" Defendants' belief that Plaintiff actions presented a threat, the totality of the circumstances on the evidence presented would not permit a reasonable jury to draw the more demanding inference that either Defendant used force for no other reason than to inflict pain on or injure Plaintiff. *Whitley*, 475 U.S. at 319, 324.

*Proportionality*

Third, there is nothing to suggest that the force used was disproportionate to the perceived threat. *See Lockett*, 526 F.3d at 876. The officers acted to close the cuff port after Plaintiff reached through it, Speigner physically, and Didion by using OC spray in an attempt to move Plaintiff away from the port. The officers further attempted to gain compliance through verbal commands at the same time. The entire struggle lasted approximately thirty seconds. *See* Ex. C, at 0:54-1:25.

Ultimately, taking all of the facts as set forth above, Defendants have established there is no dispute of material fact regarding whether Defendants used the sort of physical force "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 7. Thus, the Court finds Defendants are entitled to summary judgment because Plaintiff has not established a question of fact regarding his excessive force claim.

Qualified Immunity

Finally, Defendants contend that even if Plaintiff could establish a constitutional violation as to any Defendant, each is still entitled to qualified immunity because Plaintiff has not shown the right asserted was clearly established at the time of the alleged violation. (Doc. 25, at 17-20). Specifically, Defendants assert Plaintiff "cannot establish that the use of force involved in gaining his compliance caused him to suffer a deprivation of any clearly established statutory or

constitutional right such that a reasonable officer would understand his or her actions violated the same." *Id.* at 19-20. They further contend Barker is protected by qualified immunity "as she was not personally involved in providing or approving the medical care of Plaintiff." *Id.* at 20.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is an affirmative defense; once a defendant raises it, the burden shifts to the plaintiff to demonstrate: (1) the defendant's acts violated a constitutional right, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). A "clearly established right", for the purpose of determining whether a public official is entitled to qualified immunity, "is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Reichle v. Howards*, 566 U.S. at 664 (2012)). "A defendant bears the initial burden of putting forth facts that suggest that he was acting within the scope of his discretionary authority." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 568 (6th Cir. 2013). Once a defendant has done so, "[t]he burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (citation modified).

"For a right to be clearly established, 'existing *precedent* must have placed the statutory or constitutional question beyond debate.'" *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir.

16

2022) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). Put differently, "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Key*, 179 F.3d at 1000 (citation omitted). "When it comes to excessive force," the plaintiff's burden to point to a specific case defining the contours of the right is "especially important." *Bell*, 37 F.4th at 367. "A generic right (for example, the Fourth Amendment right against excessive force) often will not give officers proper notice about what they must do in a specific situation (for example, a domestic disturbance involving a knife)." *Erickson v. Gogebic Cnty.*, 133 F.4th 703, 710 (6th Cir. 2025).

"The plaintiff bears the burden of showing that the right was clearly established" and, to meet such a burden, "must provide on-point caselaw that would bind a panel of [the Sixth Circuit]." *Bell*, 37 F.4th at 367-68; *see also, e.g.*, *Campbell v. Hines*, 2013 WL 7899224, at *4 (6th Cir.) ("[T]he district court properly declined to address the merits of Campbell's equal protection claim, because he failed to respond to the defendants' argument that they were entitled to qualified immunity.").

As set forth above, the Court finds Plaintiff has not established a constitutional violation and the officers are entitled to qualified immunity on that basis alone. However, even if were able to establish a constitutional violation, Defendants would still be entitled to qualified immunity and summary judgment because Plaintiff has failed to satisfy his burden to establish that the right at issue "is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 577 U.S. at 12 (quoting *Reichle*, 566 U.S. at 664).

Plaintiff has failed to cite any published case (or any case law) that would compel the conclusion that Speigner and Didion's use of force applied to the facts at issue here – an inmate

17

reaching through the cuff port – was unconstitutional. Similarly, he has not provided any case law to suggest a supervisory healthcare provider such as Barker who has no responsibility for medical decision making who receives unspecified complaints and fails to respond violates the constitution. Therefore, he has not met his burden, and Defendants are entitled to qualified immunity.

Conspiracy Claim

Defendants further contend they are entitled to summary judgment on Plaintiff's claim of conspiracy. The Court agrees.

A civil conspiracy actionable under § 1983 is

[a]n agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir.1985). "[C]onspiracy claims must be pled with some degree of specificity, and vague and conclusory allegations unsupported by material facts are not sufficient to state a claim." *Hamilton v. City of Romulus*, 409 F. App'x 826, 835 (6th Cir. 2010) (citing *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003).

The only facts Plaintiff provides in his Amended Complaint and attached Affidavit as to this claim are as follows: (1) "Additional claims of conspiracy to destroy body camera evidence via Didion covering the camera lens" (Doc. 20, at 2); and (2) "Upon looking at discovery body camera on 12-31-24 Didion is seen on body camera attempting to destroy video camera evidence by covering the lens wit[h] her hand to destroy evidence" (Doc. 20-1, at 1). Review of Didion's body camera video reveals her hand covers the camera for approximately five seconds as she approaches Plaintiff's cell. *See* Ex C, at 1:00-:05. Despite this, the video footage shows Didion's

18

deployment of the OC spray, the action Plaintiff challenges. Didion avers that she at no point intentionally covered her bodycam, and "[a]ny covering of the camera was inadvertent and temporary, resulting from the chaotic nature of the struggle with Inmate Easley." (Didion Aff., at ¶ 15).

Plaintiff's allegations fall into the category of "vague and conclusory" and further fail to contain any evidence of any "agreement between two or more persons" as is required. The Court finds Defendants have demonstrated their entitlement to summary judgment on Plaintiff's conspiracy claim.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 25), be and the same hereby is, GRANTED; and the Court

FURTHER CERTIFIES, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: May 21, 2026